FILED

JAN 9 2018

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

                **Plaintiff,**

**v.**

**FELIX A. BRIZUELA, JR., GEORGE P. NAUM, III and ERIC DRAKE,**

                **Defendants.**

**Criminal No.** 1:18cr1

**Violations:**
18 U.S.C. § 2
21 U.S.C. § 841(a)(1)
21 U.S.C. § 841(b)(1)(C)
21 U.S.C. § 841(b)(1)(E)(i)
21 U.S.C. § 841(B)(1)(E)(iii)
21 U.S.C. § 846
21 U.S.C. § 856(a)(2)
42 U.S.C. § 1320a-7b(b)(1)(B)

### INDICTMENT

The Grand Jury charges that:

### COUNTS ONE THROUGH SIX

(Distribution of Controlled Substances Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Monongalia County, within the Northern Judicial District of West Virginia, defendant **FELIX A. BRIZUELA, JR.**, did knowingly, intentionally and unlawfully distribute the Schedule II controlled substances listed in the chart below, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are H.S. and whose identity is known to the Grand Jury.

| COUNT | DATE | DRUG | DOSAGE | QUANTITY |
|-------|------|------|--------|----------|
| 1 | 03/8/2013 | Oxycodone | 10 MG | 90 |
| 2 | 08/23/2013 | Oxycodone | 15 MG | 90 |
| 3 | 05/3/2014 | Fentanyl | 50 MCG/HR | 10 |
| 4 | 06/3/2014 | Fentanyl | 50 MCG/HR | 10 |
| 5 | 06/10/2014 | Oxycodone | 30 MG | 90 |
| 6 | 10/21/2014 | Oxycodone | 30 MG | 90 |

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

1

## COUNTS SEVEN THROUGH NINE

(Distribution of Controlled Substances Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Monongalia County, within the Northern Judicial District of West Virginia, defendant **FELIX A. BRIZUELA, JR.**, did knowingly, intentionally and unlawfully distribute the Schedule II controlled substances listed in the chart below, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are E.V. and whose identity is known to the Grand Jury.

| COUNT | DATE | DRUG | DOSAGE | QUANTITY |
|-------|------|------|--------|----------|
| 7 | 12/17/2013 | Oxycodone | 30 MG | 120 |
| 8 | 04/30/2014 | Oxymorphone | 10 MG | 180 |
| 9 | 11/22/2014 | Oxymorphone | 10 MG | 240 |

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## COUNTS TEN THROUGH FOURTEEN

(Distribution of Controlled Substances Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Monongalia County, within the Northern Judicial District of West Virginia, defendant **FELIX A. BRIZUELA, JR.,** did knowingly, intentionally and unlawfully distribute the Schedule II controlled substances listed in the chart below, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are N.F. and whose identity is known to the Grand Jury.

| COUNT | DATE | DRUG | DOSAGE | QUANTITY |
|-------|------|------|--------|----------|
| 10 | 07/30/2014 | Oxymorphone | 20 MG | 60 |
| 11 | 12/15/2014 | Oxymorphone | 30 MG | 90 |
| 12 | 01/31/2015 | Oxymorphone | 30 MG | 90 |
| 13 | 03/24/2015 | Oxymorphone | 30 MG | 90 |
| 14 | 07/5/2015 | Oxymorphone | 30 MG | 90 |

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

3

## COUNTS FIFTEEN THROUGH NINETEEN

(Distribution of Controlled Substances Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Monongalia County, within the Northern Judicial District of West Virginia, defendant **FELIX A. BRIZUELA, JR.**, did knowingly, intentionally and unlawfully distribute the Schedule II controlled substances listed in the chart below, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are E.J. and whose identity is known to the Grand Jury.

| COUNT | DATE | DRUG | DOSAGE | QUANTITY |
|-------|------|------|--------|----------|
| 15 | 07/11/2014 | Oxycodone | 30 MG | 120 |
| 16 | 07/30/2014 | Oxycodone | 30 MG | 120 |
| 17 | 12/18/2014 | Oxycodone | 30 MG | 120 |
| 18 | 02/4/2015 | Oxycodone | 30 MG | 120 |
| 19 | 02/17/2015 | Oxycodone | 30 MG | 120 |

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## COUNTS TWENTY THROUGH TWENTY-ONE

(Distribution of Controlled Substances Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Monongalia County, within the Northern Judicial District of West Virginia, defendant **FELIX A. BRIZUELA, JR.**, did knowingly, intentionally and unlawfully distribute the Schedule II controlled substances listed in the chart below, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are N.H. and whose identity is known to the Grand Jury.

| COUNT | DATE | DRUG | DOSAGE | QUANTITY |
|-------|------|------|--------|----------|
| 20 | 08/6/2015 | Oxycodone | 10 MG | 120 |
| 21 | 08/28/2015 | Oxycodone | 10 MG | 90 |

in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## COUNT TWENTY-TWO

(Conspiracy to Distribute Controlled Substances Outside the Bounds of Professional Medical Practice)

### Objects of the Conspiracy

Between in or about September 2008, through on or about September 13, 2016, in Hancock County, within the Northern Judicial District of West Virginia, the defendants **FELIX A. BRIZUELA, JR., GEORGE P. NAUM, III** and **ERIC DRAKE**, along with Owner Number 2, who is a co-conspirator not charged herein, did unlawfully, willfully, intentionally, and knowingly combine, conspire, confederate and agree and have a tacit understanding with each other and with other persons known and unknown, to commit certain offenses against the United States, to wit as follows:

1. To engage in the business of unlawfuly, knowingly, and intentionally distributing and causing to be distributed controlled substances without a legitimate medical purpose and outside the usual course of professional practice in violation of Title 21, United States Code, Section 841(a)(1).

### Background of the Conspiracy

2. The defendant **FELIX A. BRIZUELA, JR.** is a physician who was authorized by the Drug Enforcement Administration (DEA) to prescribe Schedule II, III and IV controlled substances and was authorized by the Substance Abuse and Mental Health Services Administration (SAMHSA) to prescribe suboxone, subutex and buprenorphine, Schedule III controlled substances, for the purpose of treating patients for opioid addiction. The defendant **FELIX A. BRIZUELA, JR.** was assigned certain DEA registration numbers for those purposes.

3. The defendant **GEORGE P. NAUM, III** is a physician who was authorized by the DEA to prescribe Schedule II, III and IV controlled substances and was authorized by SAMHSA to prescribe suboxone, subutex and buprenorphine, Schedule III controlled substances, for the purpose of treating patients for opioid addiction. The defendant **GEORGE P. NAUM, III** was assigned certain DEA registration numbers for those purposes.

4.      The defendant **ERIC DRAKE** is an individual who, along with Owner Number 2, operated the entity known as Advance Helathcare, Inc. from approximately 2007 until September 13, 2016.

5.      Sometime in or prior to 2006, the defendant **ERIC DRAKE** asked Owner Number 2 to join a business venture with him wherein the defendant **ERIC DRAKE** and Owner Number 2 would operate a drug treatment addiction center.

6.      The defendant **ERIC DRAKE** and Owner Number 2 did thereafter agree to operate a drug treatment addiction center.

7.      On or about June 2, 2006, an entity known as Advance Medical Health, LLC, which was incorporated by Owner Number 2, purchased the building at 3300 West Street, Weirton, West Virginia.

8.      In approximately 2006 or 2007, Owner Number 2 incorporated Advance Healthcare, Inc., and Advance Healthcare, Inc. purchased the building at 3300 West Street, Weirton, West Virginia.

9.      In approximately 2006 or 2007, the defendant **ERIC DRAKE** began serving as the secretary of the corporation known as Advance Healthcare, Inc.

**Manner and Means**

In order to accomplish the foregoing objects of the conspiracy to engage in the illegal distribution of controlled substances without a legitimate medical purpose and outside the usual course of professional practice, the defendants **FELIX A. BRIZUELA, JR., GEORGE P. NAUM, III, ERIC DRAKE** and Owner Number 2 used the following manner and means, among others:

10.      In approximately 2007, the defendant **ERIC DRAKE** and Owner Number 2 began operating a drug addiction treatment center and employed various physicians to assist them in operating the drug addiction treatment center which was known as or came to be known as Advance Healthcare,

Inc. at 3300 West Street, Weirton, West Virginia. Advance Healthcare, Inc. was a business whereby prescriptions for suboxone, subutex and buprenorphine, Schedule III controlled substances prescribed for the treatment of opioid addiction, were called in to and obtained from local pharmacies in West Virginia, Ohio and Pennsylvania.

11.     Patients entering the opioid addiction treatment program at Advance Healthcare, Inc. would telephone the program, undergo a new patient intake interview over the telephone, and would be scheduled for an initial visit.  Patients were required to attend weekly appointments for the first six weeks and at each appointment, were given a one-week prescription for suboxone, subutex or buprenorphine. After the first six weeks, patients were generally permitted to come every two weeks, and were given a two-week prescription for suboxone, subutex or buprenorphine at each appointment.  Patients were then generally permitted to attend appointments once every three weeks, and were given a three-week prescription for suboxone, subutex or buprenorphine at each appointment.  Thereafter, patients at Advance Healthcare, Inc. generally attended appointments once per month and received a monthly prescription for suboxone, subutex or buprenorphine at each appointment.

12.     In order to obtain a prescription for suboxone, subutex or buprenorphine, patients were required to pay out-of-pocket for their appointments.  Patients were charged $185.00 for an initial visit and were charged approximately $125.00 per additional visit.  Health insurance was not accepted for payment for services at Advance Healthcare, Inc. Consequently, patients were required to pay out-of-pocket even if they had insurance which would cover their treatment.

13.     The defendant **ERIC DRAKE** and Owner Number 2 maintained a daily presence and maintained the day-to-day operations at Advance Healthcare, Inc. on the days that the treatment center was open.  The defendant **ERIC DRAKE** assisted in the day-to-day operation of the treatment center by, among other things, collecting payments from patients, receiving phone calls from new patients seeking treatment for opioid addiction, conducting new patient intake interviews over the telephone, and

scheduling new patients for initial visits. From at least September 2008 to September 2016, the defendant **ERIC DRAKE** received the sum of at least $553,360.50 from bank accounts held by Advance Healthcare, Inc.

14.     Owner Number 2 provided the substantial and significant portion of the treatment provided to patients of Advance Healthcare, Inc. by giving medical assessments and issuing presriptions for suboxone, subutex and buprenorphine, schedule III controlled substances, to patients for the purpose of treating opioid addiction utilizing the DEA registration numbers assigned to the physicians employed by Advance Healthcare, Inc. From at least September 2008 to September 2016, Owner Number 2 received the sum of at least $550,164.39 from bank accounts held by Advance Healthcare, Inc.

15.     In approximately September 2008, Owner Number 2 began prescribing suboxone, subutex and/or buprenorphine, Schedule III controlled substances, to patients at Advance Healthcare, Inc. using DEA registration numbers assigned to the defendant **GEORGE P. NAUM, III**. The defendant **GEORGE P. NAUM, III** was engaged by Advance Healthcare, Inc. beginning at approximately the same time and was generally scheduled to maintain a presence at Advance Healthcare, Inc. on Tuesday afternoons. At approximately the same time, Owner Number 2 and/or the defendant **ERIC DRAKE** also began making payments to the defendant **GEORGE P. NAUM, III** on a bi-weekly basis from bank accounts held in the name of Advance Healthcare, Inc. From at least September 2008 to September 2016, Owner Number 2 and/or the defendant **ERIC DRAKE** paid the defendant **GEORGE P. NAUM, III** on a bi-weekly basis from bank accounts held by Advance Healthcare, Inc., the total amount of at least $303,891.17.

16.     In approximately April 2009, Owner Number 2 began prescribing suboxone, subutex and/or buprenorphine, Schedule III controlled substances, to patients at Advance Healthcare, Inc. using the DEA registration number assigned to the defendant **FELIX A. BRIZUELA, JR.** The defendant **FELIX A. BRIZUELA, JR.** was engaged by Advance Healthcare, Inc. beginning at approximately

the same time and was generally scheduled to maintain a presence at Advance Healthcare, Inc. on

Thursday evenings.   At approximately the same time, Owner Number 2 and/or the defendant **ERIC**

**DRAKE** also began making payments to defendant **FELIX A. BRIZUELA, JR.** on a bi-weekly basis

from bank accounts held in the name of Advance Healthcare, Inc. From at least April 2009, to

September 2016, Owner Number 2 and/or the defendant **ERIC DRAKE** paid the total amount of at

least $183,080.00 to the defendant **FELIX A. BRIZUELA, JR.** or to others on his behalf on an

approximate bi-weekly basis from bank accounts held by Advance Healthcare, Inc.

17.     The defendant **FELIX A BRIZUELA, JR. and GEORGE P. NAUM, III** were

required, among other things, to provide complete, fully documented physical evaluations to patients

prior to admission as a patient at Advance and to administer or dispense opiod addiction treatment

medications or supervise the administration or dispensation of opioid addiction treatment medications

by others.   Nonetheless, from the time that the defendants **FELIX A. BRIZUELA, JR.** and **GEORGE**

**P. NAUM, III** were engaged by Advance Healthcare, Inc., they permitted Owner Number 2 to provide

cursory physical evaluations to patients and administered or dispensed opioid addiction treatment

medications to patients without proper supervision.

18.     Specifically, Owner Number 2 called both new and returning patients back to the

examination room, took patients' vital signs, asked patients how they were doing, and then utilized the

DEA registration numbers assigned to the defendants **FELIX A. BRIZUELA, JR.** and **GEORGE P.**

**NAUM, III** to prescribe suboxone, subutex or buprenorphine to patients.  Owner Number 2 called those

prescriptions in to the patients' pharmacy of choice, often while the patients were still in the exam room.

Owner Number 2 performed only cursory medical examinations on the patients of Advance Healthcare,

Inc.

19.     Following each appointment, Owner Number 2 made the defendants **FELIX A.**

**BRIZUELA, JR.** and **GEORGE P. NAUM, III** aware of the medical treatment she had provided to

their patients by placing their respective patients' charts with her notations on the desks of the defendants **FELIX A. BRIZUELA, JR.** and **GEORGE P. NAUM, III**.  At the next occasion that the defendants **FELIX A. BRIZUELA, JR.** and **GEORGE P. NAUM, III** were physically present at Advance Healthcare, Inc., they reviewed the charts of their respective patients and/or signed off or initialed each chart.

20.     Neither the defendant **FELIX A. BRIZUELA, JR.** nor the defendant **GEORGE P. NAUM, III** regularly saw patients to whom suboxone, subutex or buprenorphine was being prescribed under their respective DEA registration numbers.  Some patients were seen by the defendants **FELIX A. BRIZUELA, JR.** or **GEORGE P. NAUM, III** only at their initial appointment or at one appointment early in their treatment at Advance Healthcare, Inc. Some patients received their initial prescriptions for suboxone, subutuex or buprenorphine without seeing either physician at the initial appointment, and some patients continued in treatment without ever having seen a physician during the entire course of their treatment at Advance Healthcare, Inc. Patients did not see the defendants **FELIX A. BRIZUELA, JR.** or **GEORGE P. NAUM, III** or any other physician other than, at most, on one occasion.  On occasions when patients did see the defendants **FELIX A. BRIZUELA, JR.** or **GEORGE P. NAUM, III** they received only cursory medical examinations which lasted a matter of five minutes or less.

21.     The defendants **FELIX A. BRIZUELA, JR., GEORGE P. NAUM, III** and **ERIC DRAKE** and Owner Number 2 shared in the proceeds of the illegal distribution of drugs through the receipt of monies paid by patients for the purported medical treatment and prescriptions.

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i), 841(b)(1)(E)(iii), and 846.

## COUNTS TWENTY-THREE THROUGH TWENTY-FIVE

(Aiding and Abetting the Distribution of Controlled Substances
Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Hancock County, within the Northern Judicial District of West Virginia, defendants **GEORGE P. NAUM, III** and **ERIC DRAKE**, aided and abetted by each other and by Owner Number 2, did knowingly, intentionally and unlawfully distribute suboxone film, a Schedule III controlled substance, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are W.E. and whose identity is known to the Grand Jury.

| COUNT | DATE |
|-------|------|
| 23 | 01/19/2015 |
| 24 | 08/17/2015 |
| 25 | 03/28/2016 |

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i) and 841(b)(1)(E)(iii) and Title 18, United States Code, Section 2.

## COUNTS TWENTY-SIX THROUGH TWENTY-EIGHT

(Aiding and Abetting the Distribution of Controlled Substances
Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Hancock County, within the Northern Judicial District of West Virginia, defendants **GEORGE P. NAUM, III** and **ERIC DRAKE**, aided and abetted by each other and by Owner Number 2, did knowingly, intentionally and unlawfully distribute suboxone film, a Schedule III controlled substance, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are N.S. and whose identity is known to the Grand Jury.

| COUNT | DATE |
|-------|------|
| 26 | 09/12/2014 |
| 27 | 09/04/2015 |
| 28 | 09/02/2016 |

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i) and 841(b)(1)(E)(iii) and Title 18, United States Code, Section 2.

## COUNTS TWENTY-NINE THROUGH THIRTY-TWO

(Aiding and Abetting the Distribution of Controlled Substances
Outside the Bounds of Professional Medical Practice)

On or about the dates listed in the chart below, in Hancock County, within the Northern Judicial District of West Virginia, defendants **GEORGE P. NAUM, III** and **ERIC DRAKE**, aided and abetted by each other and by Owner Number 2, did knowingly, intentionally and unlawfully distribute suboxone film, a Schedule III controlled substance, without a legitimate medical purpose and outside the usual course of professional practice, to an individual whose initials are R.M. and whose identity is known to the Grand Jury.

| COUNT | DATE |
|-------|------|
| 29 | 03/17/2015 |
| 30 | 06/15/2015 |
| 31 | 09/14/2015 |
| 32 | 10/06/2015 |

All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i) and 841(b)(1)(E)(iii) and Title 18, United States Code, Section 2.

14

## COUNT THIRTY-THREE

(Distribution of Controlled Substances)

In or about May 2016, in Hancock County, within the Northern Judicial District of West Virginia, defendant **ERIC DRAKE**, did unlawfully, knowingly, intentionally and without authority distribute a mixture and substance containing a detectable amount of suboxone, a Schedule III controlled substance, in exchange for $200.00 in United States currency, to an individual whose identity is known to the Grand Jury, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E)(i) and 841(b)(1)(E)(iii).

## COUNT THIRTY-FOUR

(Maintaining a Drug Involved Premises)

Between on or about at least January 9, 2013 and on or about September 13, 2016, in Hancock County, within the Northern Judicial District of West Virginia, the defendant **ERIC DRAKE**, while managing and controlling a medical office at 3300 West Street, Weirton, West Virginia, as an owner, lessee, agent, employee, occupant and mortgagee, knowingly and intentionally rented, leased, profited from and made available for use, with and without compensation, permanently and temporarily, the above referenced medical office for the purpose of unlawfully distributing suboxone, a schedule III controlled substance, without a legitimate medical purpose and outside the usual course of professional practice, in violation of Title 21, United States Code, Section 856(a)(2).

## COUNTS THIRTY-FIVE THROUGH FIFTY
(Illegal Remuneration in Violation of the Federal Anti-Kickback Statute)

### Operation of the Medicare Program

1.      The United States Department of Health and Human Services ("HHS") was an agency of the United States government.  The activities, operations and obligations of HHS were funded with federal monies.  Among the programs that the United States funds is the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., commonly known as Medicare.

2.      Medicare Part B covered, among other things, medically necessary services and supplies needed for the diagnosis or treatment of health conditions, including outpatient services received at a hospital, doctor's office, clinic, or other health facility.

3.      The Secretary of HHS, through the Centers for Medicare and Medicaid Services ("CMS"), administered Medicare.  CMS contracted with private insurance carriers to administer and pay Part B claims from the Medicare Trust Fund, a reserve of monies provided by the federal government. 42 U.S.C. § 1395u.

4.      Medicare provided free or below-cost health care benefits to eligible beneficiaries, primarily individuals who are at least 65 years of age or who have certain disabilities.  Medicare was a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) and a "health care benefit program" as defined in 18 U.S.C. § 24(b).

5.      Medicare was designed to pay only for services and items, such as laboratory tests and prescriptions, which were considered medically necessary, performed within accepted medical standards, and were rendered for a legitimate medical purpose.

6.      Enrolled providers of medical services to Medicare beneficiaries were eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agreed to abide by the rules, regulations, policies and procedures governing reimbursement,

17

to keep and allow access to records and information as required by Medicare.  Enrolled Medicare Providers had an obligation to Medicare and Medicare patients to render medical tests and services in an honest fashion.

### Operation of the Medicaid Program

7.      Medicaid was a welfare program co-funded by the United States and state governments. The Medicaid program was established to provide necessary and appropriate health care to the poor and impoverished who are aged, blind or disabled and members of families with dependent children. Individuals insured by Medicaid were known as "recipients." Medicaid was a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) and a "health care benefit program" as defined in 18 U.S.C. § 24(b).

8.      In the State of West Virginia, the Medicaid program was administered by the West Virginia Department of Health and Human Resources ("DHHR") through the Bureau for Medical Services ("BMS").  Medicaid was designed to pay only for services and items, such as laboratory tests and prescriptions, which were considered medically necessary, performed within accepted medical standards, and were rendered for a legitimate medical purpose.  Medicaid Providers had an obligation to Medicaid and Medicaid recipients to render medical tests and services in an honest fashion.

### Relevant Entities and Individuals

9.      At all times relevant to this indictment, Southwest Laboratories, LLC ("Southwest") was a medical laboratory physically located in Dallas, Texas that, among other things,

  a.  performed tests on the urine specimens of patients covered by private insurance companies which were referred to Southwest by physicians or sent those urine specimens to other laboratories for testing, and then billed the private insurance companies for those tests and related services; and

  b.  sent the urine specimens of patients covered by Medicare and Medicaid which were

18

referred to Southwest by the physicians to other laboratories for testing.

10.     At all times relevant to this indictment, Medscan Laboratory, Inc. ("Medscan") was a medical laboratory physically located in Williston, North Dakota that was enrolled as a provider with Medicare and Medicaid and that, among other things,

      a.  performed tests on the urine specimens of patients covered by private insurance companies which were referred to it by other laboratories in exchange for a $100.00 fee per sample; and

      b.  performed tests on the urine specimens of patients covered by Medicare and Medicaid which were referred to it by other laboratories and then billed Medicare and Medicaid for thoses tests and related services;.

11.      Sales Representative 1 was employed by Southwest as a sales representative under an independent contract to solicit physicians, such as the defendant **FELIX A. BRIZUELA, JR.**, to direct lab submissions, including urine drug screens, exclusively to Southwest in exchange for bribes and kickbacks.  Sales Representative 1 was also employed by Medscan as a sales representative under an independent contract to refer urine drug screen samples of patients covered by Medicare and Medicaid, including those urine specimens of patients covered by Medicare and Medicaid which had been submitted to Southwest, in exchange for a per-sample commission based on the number of urine specimens received by Medscan for patients covered by Medicare and Medicaid.

**<u>The Defendant Felix A. Brizuela, Jr.</u>**

12.     At all relevant times, the defendant **FELIX A. BRIZUELA, JR.**  was a licensed doctor of osteopathy who operated a medical practice in Morgantown, Monongalia County, West Virginia, in the Northern District of West Virginia (the "Morgantown Office") and elsewhere, and held himself out to be a specialist in the area of neurology.

### The Scheme

13.     Beginning in approximately September 2014 and continuing through approximately June 2016, Southwest routinely paid physicians, including the defendant **FELIX A. BRIZUELA, JR.** kickbacks to induce them to refer the urine specimens of their patients to Southwest for testing or for referral to other laboratories for testing.

14.     During the kickback scheme, Southwest paid kickbacks to physicians, including the defendant **FELIX A. BRIZUELA, JR.**, practicing medicine in West Virginia, Kentucky, Tennessee, Indiana, Texas and elsewhere.

15.     The defendant **FELIX A. BRIZUELA, JR.** regularly prescribed controlled substances to patients, including patients he saw in his Morgantown Office, for the purported purpose of treating pain and/or opioid addiction and routinely required patients receiving prescriptions for controlled substances to undergo urine drug screens.

16.     The defendant **FELIX A. BRIZUELA, JR.** was assisted by individuals known and unknown to the Grand Jury in the day-to-day operation of his medical practice in the Morgantown Office, including the collection and submission of urine specimens of patients who were insured by Medicare, Medicaid and by private insurance companies to laboratories for testing.

17.     On or about September 10, 2014, Sales Representative 1 approached the defendant **FELIX A. BRIZUELA, JR.** with an opportunity to "invest" in Southwest under a "physician owned lab investment model" through which the defendant **FELIX A. BRIZUELA, JR.** could purchase shares in Southwest for the price of approximately $1,875.00 and receive a monthly "dividend" of at least $10,000.00.  It was part of the scheme that the number of shares a physician could purchase was tied to the number of commercial samples (i.e., non-Medicare or Medicaid) that a physician had been submitting or could submit to Southwest for processing.

18.     On or about September 11, 2014, the defendant **FELIX A. BRIZUELA, JR.** signed an

"investment contract" stating that the defendant **FELIX A. BRIZUELA, JR.** elected to purchase two of the units, or shares, offered by Sales Representative 1 on behalf of Southwest.

19.     During in or about September 2014 and for a period of approximately 30 days, Southwest placed the defendant **FELIX A. BRIZUELA, JR.** on an evaluation period during which the number of commercial urine specimens of patients, including patients of his Morgantown Office, he submitted to Southwest was monitored and tallied.

20.     On or about September 22, 2014, Sales Representative 1 told the defendant **FELIX A. BRIZUELA, JR.** that in order to purchase a single share, the defendant **FELIX A. BRIZUELA, JR.** should submit 75 urine specimens from patients insured by commercial insurance during the evaluation period, and that the monthly dividend, which Sales Representative 1 had previously said was $10,000.00, had increased to $14,000.00 per share.

21.     On or about October 20, 2014, the defendant **FELIX A. BRIZUELA, JR.** was permitted by Southwest to make an "investment" of $1,875.00 via check to Southwest. This "investment" was a purchase of a single share which was based on the number of commercial urine specimens the defendant **FELIX A. BRIZUELA, JR.** submitted during the 30 day evaluation period.

22.     On or about October 22, 2014, the defendant **FELIX A. BRIZUELA, JR.** confirmed with Sales Representative 1 that the number of shares that he could purchase was limited by the number of commercial urine specimens he submitted.

23.     Thereafter, the defendant **FELIX A. BRIZUELA, JR.** submitted the urine specimens of his patients who were insured by the private insurance companies, including patients he saw in the Morgantown Office, exclusively or almost exclusively to Southwest for processing in exchange for monthly kickback payments.

24.     Southwest processed or caused to be processed urine drug screens of patients of the defendant **FELIX A. BRIZUELA, JR.** who were insured by private insurance companies and submitted

claims for reimbursement for processing the urine drug screens to the private insurance companies.

25.     On or about December 2, 2014, the defendant **FELIX A. BRIZUELA, JR.** began receiving checks and wire transfers from Southwest.

26.     On March 2, 2015, Sales Representative 1 directed the defendant **FELIX A. BRIZUELA, JR.** to begin referring all of the urine specimens of his patients, regardless of whether the patient was insured by a private insurance company or by a government program, such as Medicaid or Medicare, to Southwest in order to avoid the possibility that some valuable samples from patients covered by private insurance companies would be erroneously sent to labs other than Southwest.  Sales Representative 1 also told the defendant **FELIX A. BRIZUELA, JR.** that the urine specimens of his patients insured by Medicare and Medicaid would be redirected by Southwest to Medscan for processing.

27.     Beginning in approximately March 2015, the defendant **FELIX A. BRIZUELA, JR.** submitted the urine specimens of his patients covered by Medicare and Medicaid, including patients he saw at the Morgantown Office, to Southwest for arranging for testing in exchange for continuing the monthly kickback payments.

28.     Southwest did not process the urine specimens of patients of the defendant **FELIX A. BRIZUELA, JR.** who were insured by Medicare and Medicaid.  Rather, Southwest received these samples and, at the direction of Sales Representative 1, redirected the urine specimes collected from Medicare and Mediciad patients of the defendant **FELIX A. BRIZUELA, JR.** exclusively to Medscan for processing.

29.     Medscan then processed the samples and submitted claims for reimbursement directly to Medicare and Medicaid.

30.     After he began submitting the urine specimens of his patients covered by Medicare and Medicaid, including patients he saw in the Morgantown Office, the defendant **FELIX A. BRIZUELA, JR.** continued to receive payments in the form of checks and wire transfers from Southwest.

31.     From March 2015, that is, the time that the defendant **FELIX A. BRIZUELA, JR.** began sending the urine specimens of his patients who were insured by Medicare and Medicaid to Southwest at the direction of Sales Representative 1, the defendant **FELIX A BRIZUELA, JR.** accepted kickbacks from Southwest in the form of checks and wire transfers in the approximate amount of $204,969.59.  In total, from at least as early as on or about December 2, 2014 through on or about June 30, 2016, that is, the entire period of time that the defendant **FELIX A. BRIZUELA, JR.** referred urine specimens of his patients to Southwest, the defendant **FELIX A. BRIZUELA, JR.** accepted checks and wire transfers in the approximate amount of $287,561.00 for his referrals to Southwest.

32.     From August 2015 through January 2017, Medscan paid illegal remuneration to Sales Representative 1 in exchange for referring the urine specimens of the Medicare and Medicaid patients of the defendant **FELIX A. BRIZUELA, JR.** and other physicians solely to Medscan for processing on a per-sample basis in the total amount of $1,571,323.95.

33.     The referrals of urine specimens from the defendant **FELIX A. BRIZUELA, JR.** to Southwest enabled Southwest to submit claims for reimbursement to and collect at least $1,623,694.39 from the private insurance companies.

34.     The referrals of urine specimes from the defendant **FELIX A. BRIZUELA, JR.** to Southwest for forwarding to Medscan allowed Medscan to submit claims for reimbursement to and collect approximately $172,284.89 from Medicare.

35.     Delivery of urine specimens from the defendant **FELIX A. BRIZUELA, JR.** to Southwest for forwarding to Medscan allowed Medscan to submit claims for reimbursement to and collect approximately $34,871.61 from West Virginia Medicaid.

36.     In many instances the defendant **FELIX A. BRIZUELA, JR.** did not use the results of the urine drug screens provided by Southwest and Medscan in directing the care of his patients, in that he continued prescribing controlled substances to patients who failed urine drug screens by using

controlled substances that he had not prescribed to them and/or by failing to use controlled substances that he had prescribed to them.

37.     On or about the dates set forth below, in the Northern District of West Virginia and elsewhere, the defendant **FELIX A. BRIZUELA, JR.** did knowingly and willfully solicit and receive remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from Southwest, to the defendant **FELIX A. BRIZUELA, JR.** in return for ordering and arranging for and recommending ordering any good, service and item to Southwest, that is, the testing of patient urine specimens for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and West Virginia Medicaid as follows:

| COUNT | APPROXIMATE DATE OF KICKBACK/BRIBE | AMOUNT |
|---|---|---|
| 35 | 04/01/2015 | $25,512.12 |
| 36 | 04/22/2015 | $15,230.96 |
| 37 | 06/01/2015 | $15,230.96 |
| 38 | 07/07/2015 | $14,144.34 |
| 39 | 08/05/2015 | $22,109.27 |
| 40 | 08/26/2015 | $13,997.77 |
| 41 | 09/25/2015 | $4,391.38 |
| 42 | 10/27/2015 | $16,315.34 |
| 43 | 11/25/2015 | $12,019.10 |
| 44 | 12/23/2015 | $12,088.14 |
| 45 | 01/26/2016 | $12,087.22 |
| 46 | 02/25/2016 | $9,979.35 |
| 47 | 03/29/2016 | $9,134.25 |
| 48 | 04/27/2016 | $9,955.15 |
| 49 | 05/27/2016 | $4,455.20 |
| 50 | 06/30/2016 | $8,319.04 |

All in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(B).

## FORFEITURE ALLEGATION
Controlled Substance Act
Health Care Fraud

1.      Pursuant to Title 21, United States Code, Section 853 and Title 21, United States Code, Section 846, the government will seek the forfeiture of property as part of the sentence imposed in this case; that is, the forfeiture of any property used, or intended to be used, to commit or to facilitate the commission of the above referenced offenses, and any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offense, including real property located at 3300 West Street, Weirton, West Virginia, all funds contained in Wesbanco account number XXXX1466, held in the name of Advanced Healthcare, a money judgment in the amount of $183,080.00 against the defendant **FELIX A. BRIZUELA, JR.**, a money judgment in the amount of at least $303,891.17 against the defendant **GEORGE P. NAUM, III** and a money judgment in the amount of at least $553,360.50 against the defendant **ERIC DRAKE**.

2.      Pursuant to Title 18, United States Code, Section 982(a)(7) and Title 42, United States Code, Sections 1320a-7b(B)(1)(A) and (B)(1)(B), the government will seek the forfeiture of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to violations of a Federal health care offense as defined in Title 18, United States Code, Section 24, including a money judgment in the amount of at least $204,969.59.

3.      Pursuant to Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), the government will seek forfeiture of substitute property up to the value of property subject to direct forfeiture that is not available for forfeiture on account of any act or omission contemplated by Title 21, United States Code, Section 853(p)(1).

A true bill,

/s/_____
Foreperson

/s/_____
William J. Powell
United States Attorney

Sarah E. Wagner
Assistant United States Attorney

Robert H. McWilliams, Jr.
Assistant United States Attorney

27