**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                  **Criminal Action No.: 1:18-CR-1-2**

                                         **JUDGE KEELEY**

**GEORGE P. NAUM III,**

        **Defendant.**

## REPORT AND RECOMMENDATION DENYING THE MOTION TO SUPRESS

       This matter is before the undersigned pursuant to an Order Re-Submitting Defendant's Motion to Suppress entered by Senior United States District Judge Irene Keeley on March 18, 2019.  (ECF No. 215). A Motion to Suppress was filed by Defendant on March 11, 2019 (ECF No. 204). This matter has been fully briefed and oral argument was heard on the matter on March 21, 2019. (ECF No. 216). This matter is now ripe for a report and recommendation to the Honorable Irene Keeley. Accordingly, the undersigned **RECOMMENDS** that the Motion be **DENIED** in this entirety for the foregoing reasons.

### I.     FACTUAL BACKGROUND

       On January 1, 2018, George P. Naum, III, was indicted on eleven counts of a fifty count indictment. (ECF No. 1). Defendant Naum was charged with Conspiracy to Distribute Controlled Substances Outside the Bounds of Professional Medical Practice in violation of 21 U.S.C. Section 841(a)(1), 841(b)(1)(E)(i), 841(b)(1)(E)(iii), and 846 (Count Twenty-Two); and Aiding and Abetting the Distribution of Controlled Substances Outside the Bounds of Professional

Medical Practice in violation of 21 U.S.C. Section 841(a)(1), 841(b)(1)(E)(i), 841(b)(1)(E)(iii), and 18 U.S.C. Section 2 (Counts Twenty-Three through Thirty-Two).

On September 13, 2016, four search warrants were executed simultaneously at four separate locations—Cambridge, Ohio (hereinafter "Cambridge search warrant"); Advance Healthcare in Weirton, West Virginia; the Morgantown, West Virginia Office; and Dr. Brizuela's residence. The connection between the Cambridge Office and the investigation was that investigators believed that Defendant was using his Ohio DEA Registration Number—BN2845583—to prescribe patient's controlled substances in West Virginia and that Defendant did not have a valid West Virginia DEA Registration Number. ECF No. 218, at 17. Following the execution of all the search warrants, investigators discovered that Defendant did have a West Virginia DEA Registration Number.[1] The evidence seized during the Cambridge search was subsequently sealed off from the investigators. Also, during the execution of the Cambridge search warrant, Defendant participated in an interview that lasted approximately 90 minutes.

## II.   PROCEDURAL POSTURE

### a.   Motion to Suppress and Accompanying Memorandum (ECF Nos. 204-05)

On March 11, 2019, Defendant, by and through counsel, filed a Motion to Suppress arguing that because of the defective Cambridge search warrant, evidence obtained from the Cambridge Office should be suppressed because the evidence was discovered in violation of Defendant's Fourth Amendment rights. (ECF No. 204). Moreover, Defendant argued that the statements that he made during the September 13, 2016 Interview should be suppressed because the statements were taken during the execution of a defective warrant, but also in violation of

---

[1] During the Motion Hearing, the Government stated that while the Government "rushed" to be candid with the courts and sealed off the information, the Government has determined that the information in the warrant was not wrong and that Defendant was in fact using his Ohio DEA Registration Number to prescribe controlled substances to patients in West Virginia.  See Government's Second Supplemental Response, ECF No. 219.

Defendant's Fifth Amendment rights against self-incrimination and the Sixth Amendment rights to assistance of counsel.

### b. Government's Response to the Motion to Suppress (ECF No. 211)

On March 15, 2019, the Government filed a Response stating that it did not intend to use any statements made by Defendant Naum during the September 13, 2016 Interview and the evidence obtained has been sealed from both the U.S. Attorney's Office and the investigating officers. Furthermore, the Government stated that it does not object to the Motion. Id.

### c. Judge Aloi's Original Report and Recommendation (ECF No. 212)

On March 15, 2019, the undersigned entered a Report and Recommendation recommending that the Motion to Suppress be denied as moot. The undersigned reasoned that because the Government did not object to the Motion and did not intend to introduce the evidence, the Motion was moot.

### d. Defendant's Objection to the undersigned's Report and Recommendation (ECF No. 214).

On March 18, 2019, Defendant, by and through counsel, filed his objections to the undersigned's Report and Recommendations. In his Objections, Defendant clarified his Motion arguing that the information that the Government obtained during the September 13, 2016 interview, in violation of his Fifth and Sixth Amendment, were used in the manner and means portion of the indictment. (ECF No. 214, at 3). Furthermore, that the defective warrant "tainted" subsequently discovered evidence.

      **e.  Government's Response to the Motion to Suppress (ECF No. 218) (hereinafter "Government's First Supplemental Response")[2]**

On March 20, 2019, the Government filed its First Supplemental Response arguing the Motion to Suppress should be denied. The Government argued that all of the information that Defendant disclosed during the September 13, 2016 Interview was known to investigators prior to the interview or obtained by independent means. The Government pointed to the affidavit for the four search warrants[3] that were obtained in September 2016 to demonstrate the information known prior to Defendant's statements. Furthermore, the Government stated that it did not rely on the statements obtained during the Interview with Defendant because the Government believed Defendant was not being truthful during this interview. The Government also argued that the warrant was based on probable cause based on the mistaken belief that Defendant only had one DEA registration number, BN2845583, but because investigators made a good-faith effort to provide accurate information in regard to Defendant's DEA Registration Number held by Defendant Naum, the warrant was valid. The Government also provided a list of independent sources that provided information to investigators to demonstrate that it did not rely on Defendant's September 13, 2016 statements. *See* ECF No. 218, at 14-33; ECF No. 218 Exhibits 1-16; ECF No. 221-1.

      **f.  Government's Second Supplemental Response to Motion to Suppress (ECF No. 219)**

On March 21, 2019, the Government filed its Second Supplemental Response to Defendant's Motion informing the court that Defendant was in fact using his Ohio DEA

---

[2] ECF No. 218 is the Government's First Supplemental Response. ECF No. 217 is the same document sans the attachments. Due to filing difficulties, the USA was forced to the file the Response without the attachments. The technical issue was remedied and USA filed its First Supplemental Response as ECF No. 218.

[3] Of the four search warrants, three were issued by Magistrate Judge's in the Northern District of West Virginia. *See* 5:16-MJ-43, ECF No. 1-3; 1:16-MJ-114, ECF No. 1-3; 2:16-MJ-416 (Southern District of Ohio), ECF No. 3-1. A copy of this was provided to the District Court as a courtesy because the search warrant provided by parties in the pleadings was for Advance Healthcare. This document is also available on Pacer.

4

registration number to prescribe suboxone to patients in West Virginia in violation of federal law. The Government argued that despite their rush to be candid with the court regarding the mistaken information, the Government was originally correct in the search warrant affidavit that Defendant was using his Ohio DEA registration number to prescribe suboxone in West Virginia.

> **g. Government's Third Supplemental Response to the Motion to Suppress (ECF No. 221)**

During the Motion Hearing on March 21, 2019, the undersigned requested that the Government supplement the Record with the audio recording of the September 13, 2016 interview of Defendant and the Records that the Government believes demonstrated that the Conspiracy began in 2008—which Defendant argued that the Government did not know but for his statements during the September 13, 2016 interview.[4]

> **h. The Motion Hearing**

During the Motion Hearing, neither party presented live testimony of witnesses. The argument and proffers presented by both the Government and Defendant were supported by documents.

> **i. Sufficiency of Warrant/Leon Good-Faith**

The Government argued that the warrant was based on probable cause because, based on the information known to officers at the time of the application, there was reason to believe that Defendant was prescribing controlled substances using his Ohio DEA Registration Number in West Virginia. (March 21, 2019 Motion Hearing, at 9:00 AM[5]). The Government proffered that it was their belief that any medical records contained in the Cambridge Office would evidence this theory, as medical records are required to be kept in the location that the registration number

---

[4] A copy of this audio recording was provided on a disk to the undersigned's law clerk and has been presented to the District Judge's chambers upon the entry of this Report and Recommendation.
[5] This citation will be shortened throughout the Report and Recommendation.

is assigned, and any absence of these documents would be further evidence that Defendant was violating the law. Id. at 9:01. The Government, after being notified of the mistake, sealed these documents out of an abundance of caution. Id. These search warrants were executed simultaneously with the other three warrants and Defendant's valid West Virginia Registration Number was discovered during the Advance Health Care search. Id. at 9:02. The Government argued that the Leon good-faith exception would "save" the warrant and any evidence obtained as a result of that warrant, including statements made by defendant during the execution of said warrant.

The Government argued that case agents, prior to the application of the search warrant, searched the DEA Registration Number database and found that Defendant only had one valid DEA Registration Number—BN2845583. Id. at 9:05 AM. The case agent and two Diversion Investigators re-searched the names and only found one valid entry for Defendant. Id. The Government classified this as an "honest mistake," but argued that the case agents were diligent in their search. Id.

Following the discovery of the mistake, the Government authored three letters to all three Magistrate Judge's outlining the discovery of the mistake:

> In the days leading up to the application for the search warrant, Diversion Investigator Guy McCartney of the DEA had accessed the Registrant Information Consolidated System (RICS) which is a database operated by the DEA which identified physicians who are registered with the DEA to prescribe controlled substances. DI McCartney ran a query by last name for "Naum" and identified five entries that contained variations of Dr. Naum's name. The only entry that showed an active DEA registration number was the entry for registration number BN2845583. Two other diversion investigators, DI William Crawford and his partner DI Rachel Tompkins, who were tasked with seeking the voluntary surrender of Dr. Naum's DEA license, had also accessed the RICS system in the days leading up to the execution of the search warrants and ran a query under the last name "Naum." Like DI McCartney, DI Crawford and DI Tompkins identified only one registration number, BN2845583, associated with the Dr. Naum.

ECF No. 205-1, at 2.

The Government further argued that the mistake contained in the Cambridge affidavit did not affect the validity of the other warrants, and the mistake, only took away the connection from the Cambridge Office and the unlawful behavior. Motion Hearing at 9:15 AM. The Government stated it now knows that the connection still exists because information obtained later demonstrated that Defendant was prescribing medication using his Ohio DEA Registration Number in West Viriginia. Id.

Defense Counsel argued that the statements contained in the affidavit provided no probable cause that there was a crime being committed by Defendant. Id. at 9:20-9:22. Defense Counsel argues that Paragraph 11 of the Affidavit stated that Defendant Naum had a practice in Cambridge, Ohio—which does not provide probable cause that a crime was committed. Id. Paragraphs 57 and 58 stated that the number of patients that Defendant could treat was increased—which Defense Counsel argues does not create probable cause. Id. Paragraphs 69-79 stated that Defendant Naum treated patients, looked at records, and prescribed suboxone—which Defense argues does not create probable cause. Id. Paragraphs 89 and 91 stated that Defendant was present on the last three Tuesdays of May 2018. Id. Defense Counsel argued that the basis of the warrant was that Defendant was using his Ohio DEA Registration Number in West Virginia—which at the time was believed to be false Id. at 9:23. Defense Counsel argued that officers should have known that because Defendant Naum had several relatives who were also doctors, they may need to search another name in the DEA registration database. Id.

### ii. Custodial Interrogation

The Government argued that the September 12, 2016 Interview, during which Defendant made several statements, was a non-custodial and voluntary interview. Id. at 9:08. The Government argued that at the beginning of the interview, Diversion Investigator Crawford told

Defendant he was free to leave. The Interview took place in the hospital, in an adjacent room to the Cambridge Office. Furthermore, DI Crawford did not have a firearm, nor is he permitted to carry a firearm, did not have handcuffs, and did not have arresting authority. Id. at 9:08-09. The Government stated that during the interview that there was one DI agent and a member of the Ohio State Medical Board. Id. at 9:09.

Defense Counsel argued that Defendant Naum had never been arrested before, "had no idea what to do," and he is with all his staff and employees. Id. at 9:29. Defense Counsel further argued that while he was told he was free to leave, he was not going to leave because all of his medical records and staff were still at the Cambridge location. Id. Defense Counsel also stated that the tone of the interview was very accusatory; the interviewers told Defendant that he was lying and that he was going to be convicted. Id.

### iii. Fruit of the poisonous tree

The Government further argued that even if the statements were taken in violation of his Fifth and Sixth Amendment rights and the search warrant was invalid, other independent sources provided the information and was obtained either simultaneously to the execution of the Cambridge Warrant or was obtained from an independent source. Id. at 9:11. The Government argued that it understood prior to the search warrant about the structure of what the Government calls the "conspiracy." Furthermore, the Government stated that the only new evidence that was provided by Defendant Naum's statements was that Ms. Jackson did not have medical authority. Id. at 9:13. The Government stated that they did not rely on this information because they understood this information to be false. Id. at 9:13-14. The Government reiterated its belief that the search warrant was executed lawfully and does not concede that either the interview or the evidence was taken in violation of the law. Id. at 9:17.

Defense Counsel argued that the Manner and Means provided in the Indictment mirrors the information discovered during the September 13, 2016 Interview. Id. at 9:18. Defense Counsel argues that the affidavit attached to the Cambridge search warrant "freezes" the information known to officers and the Government and any other information was obtained unlawfully. Id. Specifically, Defense Counsel pointed to the date that the conspiracy allegedly started according to the Indictment. The Indictment stated that the conspiracy started in 2008, but the information contained in the Affidavit provided only information known on or after 2015. Id. at 9:19. There is no information contained in the Affidavit from 2008 to 2015. Id. at 9:19.

Defense Counsel also stated that without the testimony of the officers, there is no evidence that the officers conducted a completely taint free interview. Id. at 9:34. There is no evidence that the officers were not affected by the false information and that information could have been relayed through their interview. Id.

### III.   ANALYSIS

#### a.   The Warrant provided mistaken information but is protected by <u>Leon</u> Good-Faith Analysis.

Defense Counsel argued that the mistaken information (that Defendant only had one valid DEA registration number) contained in the warrant invalidated the warrant, and the statements made by Defendant during the execution of the Cambridge Search Warrant would not have occurred and should be suppressed.

Courts can apply the exclusionary rule when evidence is seized in violation of the Fourth Amendment and will excluded in order to achieve the overarching purpose of future deterrence. United States v. Andrews, 577 F.3d 231 (4th Cir. 2009). That overarching purpose, however, is not achieved when "an officer act[ed] with objective good faith." Id. at 235. Courts should not suppress evidence when a search warrant is "conducted under the authority of a warrant, even a

9

'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known hat the search was illegal despite the magistrate's authorization.'" United States v. Bynum, 293 F.3d 192 (4th Cir. 2002).   The Leon good-faith exception is not applicable in circumstances where an officer's reliance on said warrant is not "objectively reasonable." This includes: where (1) probable cause is based on statements in an affidavit that are knowingly or recklessly false; (2) the magistrate fails to perform a "neutral and detached" function and instead merely rubber stamps the warrant; (3) the affidavit does not provide the magistrate with a substantial basis for determining the existence of probable cause; or (4) the warrant was so facially deficient that the executing officer could not reasonably have assumed is was valid." United States v. Leon, 468 U.S. 897, 914-15 (1984).

Here, there is no evidence that the Magistrate Judge who issued the warrant failed to perform his duty as "neutral and detached," nor is there evidence presented that the warrant was so facially deficient that an executing officer "could not reasonably have assumed it was valid." The two concerns were whether 1) the affidavit was lacking in probable cause that would render the warrant invalid, and 2) whether the probable cause was based on knowingly or recklessly false information.

First, the undersigned considers whether the affidavit "is 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" The affidavit presented to the Magistrate Judge was a 53 page document that contained information about the doctors, their business and business practices, and alleged illegitimate prescribing practices. See ECF No. 218-1, at 5. During the time prior to and up to the execution of the warrant, law enforcement believed that Defendant Naum had only one DEA registration number, which was issued to him in Ohio to use in Ohio. Law enforcement believed that Defendant Naum was illegally practicing

in West Virginia and using his Ohio DEA registration number. During the Motion Hearing, the Government stated that the search warrant affidavit was based on this belief and only learned otherwise once the search warrant was executed. ECF No. 218, at 17.  Based on the information known at the time of the search warrant, even though some of the information is wrong, there was a sufficient demonstration of probable cause to the Magistrate Judge. Accordingly, the undersigned finds that the warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

Second, the undersigned considers whether the information contained in the affidavit is knowingly or recklessly false. <u>Leon</u>, 468 U.S. at 914. As there are no allegations that law enforcement intentionally misled the Magistrate Judge, the undersigned will consider whether the mistaken information presented was recklessly false. The Government argued that several different law enforcement agents conducted a database and each search rendered the same five entries—which indicated that Defendant only had one valid DEA registration number. The fact that Defendant had a valid DEA registration number in West Virginia was not known to officers until during or after the execution of the search warrant. Several Diversion Investigators searched for the name, using a search term "Naum" and not "Naum III," and that the search term "Naum" rendered five results, which were known to be Defendant Naum. Finally, the Government sealed the information off from further use, which further demonstrates that the officers were acting in good-faith and the information was not recklessly false. The undersigned concludes that failing to obtain the correct search term to use in a database search does not equal reckless disregard for the truth. The undersigned finds that the police officers acted in good-faith and false information was neither intentionally or recklessly provided.

**b.  Defendant was not in custody for the purpose of his <u>Miranda</u> Rights.**

When an individual is in custody, any "[s]tatements obtained from [a] defendant during . . . interrogation are presumptively compelled," unless 1) the defendant has been adequately informed of his <u>Miranda</u> rights, and 2) the defendant has waived said rights. <u>United States v. Graves</u>, 545 Fed. App'x 230 (4th Cir. 2013). During all "critical stages" of criminal proceedings, a defendant has a right to have counsel present pursuant to the Sixth Amendment. <u>Montejo v. Louisiana</u>, 556 U.S. 778 (2009). A custodial interrogation is one of those proceedings. <u>Id.</u>

To determine whether an individual is in custody, courts need to examine whether under the totality of the circumstances, a reasonable person would have felt that their "freedom from action is curtailed to a degree associated with formal arrest." <u>Id.</u> (quoting <u>United States v. Colonna</u>, 511 F.3d 431 (4th Cir. 2007)). Courts must make a two part inquiry: 1) "what circumstances surrounded the interrogation," and 2) "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 100 (1995).  As to the first inquiry, the court will consider several factors, including but not limited to, 1) length of the interview, 2) whether individual was free to leave following the interview, 3) whether an individual was told that he was under arrest or being detained, 4) casual nature of the interview, 5) the setting of the interrogation room, 6) whether individual was handcuffed or agents drew their weapons, 7) location of the interview, 8) who was interrogating the individual and how many officers present, 9) whether there was anyone else present. <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977) (finding no indication that freedom to depart was restricted when the defendant voluntarily went to the police station, respondent told he was not under arrest, a short 30 minute interview, and respondent left police station following the interview); <u>United States v. Uzenski</u>, 434 F.3d 690 (4th Cir. 2006) (defendant being offered refreshments, allowed to leave the room to use the restroom, door was left partially open, and being told he was

not under arrest); <u>Davis v. Allsbrooks</u>, 778 F.2d 168 (4th Cir. 1985) (considering the large, carpeted, air-condition room, defendant was given a soft drink, defendant was drive home by police following the interview); <u>United States v. Parker</u>, 262 F.3d 415 (4th Cir. 2001) (considering that defendant was not handcuffed, no weapons, relative's present during interview, and interview took place in defendant's home); <u>United States v. Colonna</u>, 511 F.3d 431 (4th Cir. 2007) (considering the presence of 23 FBI agents, defendant was at gun point, restricting the actions of others, physically restrained in a police vehicle).

Furthermore, if the interview involves a person that is suspected to have committed a crime, there will be "coercive aspects" to the interview and this alone does not render a person in custody. <u>Thompson v. Keohane</u>, 516 U.S. 99 (1995). Upon consideration of the totality of the circumstances, the undersigned finds that Defendant's September 13 statement were made voluntarily and not made while Defendant was in custody requiring his <u>Miranda</u> rights. The undersigned considered the following:

The September 13 interview was completed during the execution of a search warrant on the Cambridge Office. Present during the interview was Defendant, Michelle Richards with the Ohio State Medical Board and DEA Diversion Investigators Doug Crawford and Rachel Thompkins. DEA Diversion Investigators Crawford and Thompkins were the only people present who were employed by law enforcement.[6] Ms. Richards informed Defendant of who she was[7] (ECF No. 218-7, at 1) and Officer Crawford also informed Defendant that she was with the State Medical Board. <u>Id.</u> Defendant was informed that he was "free to go, any time you wish.

---

[6] While the USA stated that Crawford did not have arrest power nor did he carry a weapon, the undersigned does consider him as law enforcement because a reasonable person would likely not readily know that information and a reasonable person would likely view him as an officer.

[7] The undersigned frequently cites the unofficial transcript presented by the USA in ECF No. 218-7. The undersigned cites to this transcript for clarity of the record. The undersigned is not solely relying on the unofficial transcript. The undersigned has verified the accuracy of the portions of the transcript cited, and has noted any mistakes herein.

Uh, but [investigators] would *like* to talk to [him] for a few minutes." Id. (emphasis added).
Defendant was informed that investigators were in the office with a search warrant for his
records and that the investigation concerned Sharon Jackson and Eric Drake. Id. The Interview
lasted approximately an hour and a half. During the Motion Hearing, the Government proffered
that no one was armed nor was Defendant handcuffed or told he was under arrest. Defendant was
allowed to leave following the interview—he was not arrested—and was told by Ms. Richards
that he was still allowed to continue with his practice, just not prescribe controlled substances.
Id. at 42-51.

Furthermore, the undersigned finds that Defendant's argument that the interview was
accusatory to be inaccurate. The tone of the interview was very conversational and only became
tense approximately 55 minutes in to the interview when Diversion Investigators began
discussing Defendant's inaccurate information. The undersigned finds that although the
interview became tense and serious towards the end, this would fall within the acceptable
"coercive aspects" that are permitted in any law enforcement interview. See Thompson, 516 U.S.
99. The undersigned finds that Defendant was not in custody for the purposes of Miranda
because no reasonable person would have felt that their freedom was curtailed and DEA agents
were not required to Mirandize Defendant.

> **d.    Defendant did not unequivocally invoke his right to an attorney.**

Defense Counsel also argued that during the custodial interview of Defendant, Defendant
requested that he speak to his attorney and that he was not permitted to do so. For the foregoing
reasons, the undersigned finds that Defendant did not unequivocally invoke his right to an
attorney.

A person in custody, who has either been arrested or if his freedom of action curtailed, must be read his Miranda rights, which includes informing a defendant of their right to an attorney. Burkey v. Angelone, 208 F.3d 172 (4th Cir. 2000) (citing Stansbury v. California, 511 U.S. 322 (1994)). Once a defendant in custody requests the presence of an attorney, the defendant cannot be subjected to further police interrogation until defendant has counsel present. Id. (citing Edwards v. Arizona, 451 U.S. 477 (1981)). When an individual is subject to interrogation and has unequivocally invoked his right to counsel, the interrogation must cease "unless the accused himself initiates further communications, exchanges, or conversations with the police. Id. When an individual is not in custody, that individual's Fifth Amendment right to counsel may not be invoked. Id. (citing United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999)).

First, the undersigned has found that Defendant was not in custody for the purposes of Miranda and any request made by Defendant to have an attorney does not require the interrogation or interview to stop.  There was no mention of any attorney, request for an attorney, or even the use of the word attorney/lawyer until almost an hour into the interview. At this point, DI Crawford and Ms. Richards began explaining Defendant's options regarding a potential surrender of both his DEA Registration Number and RX Number.

| William Crawford: | So with your options in mind, I have a form here that you can sign saying that you want to voluntarily surrender your DEA registration today. |
| George Naum: | Can I talk to my lawyer? |
| William Crawford: | You can talk to your lawyer. |
| George Naum: | Yeah. |
| William Crawford: | Okay. |
| George Naum: | I'm not saying that I won't do that, but I would at least like to get legal advice before— |

15

<div style="padding-left:2em">

William Crawford:     *Okay*.

George Naum:          *--before I do that*.

</div>

Id. at 39 (emphasis added). Defendant specifically asked to speak with his attorney to get legal advice as to whether he should surrender his DEA Registration Number. It is also important to the analysis that Crawford stated that he could talk to his lawyer. The undersigned believes that because Defendant was so specific as to what he was going to discuss with his attorney and did not request the attorney's presence at the Interview, Defendant did not unequivocally request an attorney.

The undersigned further examines the statements made by Defendant which encouraged additional questions following his "request" to speak with his attorney. Specifically, after Richards and Crawford explained the process and consequences of surrendering his DEA registration number, Defendant asked:

<div style="padding-left:2em">

George Naum:          Why would they give me another one?

. . .

George Naum:          I-I'm assuming this is going to go in front of the medical board and then, because this has happened. Correct?[8]

</div>

. . . .

Defendant kept continuing the conversation, asking questions of Ms. Richards and Agent Crawford. Moreover, he then repeatedly requested that they ask any more questions that they may have.

<div style="padding-left:2em">

Michelle Richards:    Is there anything else about that practice that we need to know about? That you can think of.

George Naum:          That I can think of? Ask me anything else that you want to.

</div>

---

[8] ECF No. 218-7, at 44.

| Michelle Richards: | I mean, anything that you are thinking now okay, probably should know this. This, this is going on and I know it's wrong. Something is happening and I need to let somebody know. Now would be the time. |
| George Naum: | Okay. Well, my, I mean, things are pretty jumbled right now. Um, nothing that I can think of. If you—you want to ask me about anything, I—anything further please do that. |
| William Crawford: | Do you have a cell phone number? |
| George Naum: | Yeah. |
| Michelle Richards: | Go ahead. |
| George Naum: | It's, um, 304-780-9114. |
| William Crawford: | Okay, if I think of anything else, I will give you a call. |
| George Naum: | Okay. I hope I cleared things up for you. |
| Michelle Richards: | It isn't clear, but— |
| William Crawford: | It's better. |
| Michelle Richards: | It's more information, yeah. |
| George Naum: | Okay. And there's nothing else you want me to do or? |
| William Crawford: | Not at this point. Um, neither one of us— |
| George Naum: | Anything I can clear up for you? |

ECF No. 218-7, at 44.

After this time, Michelle Richards and Crawford left the room, leaving Defendant and Rachel Thompkins. Defendant then asked Ms. Thompkins, "Do you have anything that you need to ask me?" Id. at 46. After further questioning regarding his Cambridge Office, Defendant stated, again, "whatever you need to ask me, go ahead." Id. at 48.

Moreover, Defendant did not provide any substantive information that the Government relied on or that Defendant provided following this request. The rest of the interview was a discussion on what Defendant was permitted to do after he had voluntarily relinquished his DEA Registration Number. See generally id. at 39-51.

17

The undersigned considered all of these factors in concluding that while Defendant is not in custody for the purposes of <u>Miranda</u> and Defendant did not request counsel for the purposes of the interview. Accordingly, the undersigned finds that the Government was not required to provide a <u>Miranda</u> warning to Defendant, his statement was made voluntarily in a non-custodial capacity, and his request for an attorney was made at the end of the interview and for the limited scope of determining legal consequences for voluntarily surrendering his DEA Registration Number.

### a. The information relied upon by the Government was obtained through independent sources.

Even if the search warrant was invalid and the statements of Defendant Naum were taken in violation of the law, there is sufficient evidence that the information was discovered through the "independent source doctrine," and is still admissible.

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course, this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others.

<u>Segura v. United States</u>, 468 U.S. 796 (1984). Thus, if the evidence that was discovered "wholly independent" from any constitutional violation it may be admitted in light of that constitutional violation. <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984).

Defense Counsel argued that the following information was taken and used from Defendant Naum's statements and there was no independent source of the information:

1. Dr. Naum works at AHC on Tuesdays 3-4 to 7-8
2. Identified Brizuela as other doctor there
3. Patient procedure involved: Taking history Examining Patient Depending on prior dose, they are started anywhere between 8mg to 24mg Used a COWS scale 1 week follow-up Same dose for three months Did not do in-office induction

     Assesses dose based on experience based on 8 years of experience Doesn't prescribe more than 24mg at a time.

4. All prescriptions are called in
5.  Staff keeps track of his total number of patients
6.  AHC is 3300 West Avenue Weirton WV
7. Do you see every patient? Every week? No. "They come in and they see me, I check the nurse's notes who I've been working with for 8 years, check the med list" Scripts can be called in any day without the patient seeing the physician. Naum – Tuesday Brizuela – Thursday No doctor - Wednesday Naum believed that chart reviews is sufficient based on what he has read and people he spoke with. Prefers that patients go to counselor but a lot don't have insurance and its costly to see a counselor. Patients have to go somewhere so they go to NA, its not optimal. If a patient does not have a signed log, they are warned and must bring it back next week.
8. Discharge If patient fails to show up If patient has an inconsistent drug screen
9. Cash only Insurance can be used to pay for medications Office visit fee is $185 then $125 Facility takes credit cards and used to take checks
10.  Urine Screens Usually has them drop every 8 wks Tests for sx, amphetamines, cocaine, opiates (Heroin, methadone, oxycodone) Uses dip stick urine drug screen, sends to a lab if patient does not agree with urine.
11. Sharon did not have authority to make medical decisions Has PMP access Only run OARRS every three months Jackson is refilling but getting weaned by Dr. Naum's instructions Jackson does not make unilateral decisions about weaning patients. There would have been prior authorization. Not all 90 patients come in every week. Some are every week, some every two, some every month. Jackson is not making any weaning calls on her own. Typically patients are weaned every three months and every six months.
12. Patients are not typically seen by the physician unless they need to be seen by him or if they are having other problems.
13.  Paid by check and paid by AHC office check. Does not receive any payment from the pharmaceutical business Never paid in cash Paid $1500 every two weeks. Not based on number of patients – it's a straight fee.

ECF No. 214, at 4-5.

     The Government delineated the source of information and the time that the information was obtained to all the information that Defense Counsel stated came from the September 13, 2016 Interview. The Government stated that that investigators knew that Defendant Naum worked at Advance Healthcare on Tuesdays and his expected hours and provided this information in the Advance Healthcare Affidavit. ECF 218-1 ¶11, 31, 32, 86-90. The Government stated investigators knew of Dr. Brizuela's identity prior to the search as his name

and information concerning Dr. Brizuela's involvement were contained in the Advance Healthcare Affidavit. ECF 218-1 ¶¶ 2,3, 9(b).  It is important to note that this information is derived from the Advance Healthcare search warrant affidavit which was information known prior to the searches. The Government stated that investigators knew of the procedures prior to the execution of the search warrant because two undercover agents entered the facility masking themselves as patients. ECF 218-1 ¶¶69-90. This information was also obtained from patient records at Advance Healthcare which documented each visit and any prescriptions. ECF No. 218-6.

The Government knew that Ms. Jackson called in prescriptions prior to the application of the search warrant. Advance Healthcare Affidavit. ECF 218-1 ¶ 67(e); ECF No. 218-12, at 2. This information was also provided through Patient interviews. ECF Nos. 218-11, 12, 13, 14, 15. The Government demonstrated that they knew prior to the execution of the warrant that staff tracked the number of suboxone patients being treated. ECF 218-1 ¶ 60. The undersigned notes that this Paragraph specifically pertains to Dr. Brizuela. There is no indication that it could not also apply to Defendant Naum, but Defense Counsel did not object to this argument at the Motion Hearing nor subsequently. The Government demonstrated that the address of Advance Healthcare was known to investigators prior to the execution of the search warrant. ECF 218-1 ¶ 1.

The Government demonstrated that Defendant Naum did not see each patient at every visit as undercover agents disguised as clients, visited the clinic and witnessed this first hand. ECF 218-1 ¶¶ 75-82; ECF No. 218-11, at 2; ECF No. 218-12, at 2. Moreover, the Affidavit states that the pharmacist was told that many patients stated that they did not know who their doctor was or believe Ms. Jackson to be the doctor. ECF 218-1 ¶¶ 67(c, d, g). The Government state

that investigators knew that patient's attended Narcotics Anonymous in lieu of counseling and this information was contained in the Advanced Healthcare Affidavit. ECF 218-1 ¶¶ 77-81, 67(e). Moreover, the Government discovered this information through patient interviews. ECF No. 218-11, 12, 14, and Ms. Jackson, herself, stated that patients were only required to attend Narcotics Anonymous meetings, ECF No. 218-15. The Government demonstrated that investigators were aware of the discharge policy as undercover agents went to the clinic as a patient. ECF No. 218-16.

The Government demonstrated that investigators knew of the costs prior to due to the undercover agents and patients. ECF 218-1 ¶ 65; ECF No. 218-11, at 2. The Government demonstrated that investigators knew that patients were not required to take urine drug screens each visit, from undercover agents, and discovered through medical records at Advanced Healthcare, as to the frequency. ECF 218-1 ¶¶ 70, 72, 76; ECF No. 218-6. The Government also demonstrated that Defendant Naum was paid as a result of prescribing controlled substances at Advanced Healthcare. ECF No. 218-2. The Government also knew that Defendant Naum began his business relationship with Advanced Healthcare in 2008 from independent bank records. ECF No. 218-15, at 2; ECF No. 221-1.

Defense Counsel further argues that Paragraph 11 of the Indictment contains information only provided by Defendant, evidenced on Page 9 of the Government's "Unofficial Transcript" provided at ECF No. 218-7. The Government argued that this information was obtained simultaneously to the execution of the Cambridge search warrant and was not affected by the execution of a search warrant that contained a mistake. ECF No. 218-6, 15. Exhibit 6 are patient medical records obtained with a warrant—Advance Healthcare—that was not affected by that mistake and taken simultaneously as the Cambridge warrant.

Defense Counsel argues that without testimony of interviewing officers, there is no way to truly determine what interviewing officers knew prior to the interview and what information was conveyed to the witnesses, from whom a lot of the information was received. Defense Counsel emphasizes the existence of an overwhelming taint that the "defective" warrant places on all subsequently discovered evidence. The undersigned finds that there is no evidence that this information did not originate from wholly independent sources or that this independently found evidence would have been affected by the alleged illegal search or the statements of Defendant Naum. Moreover, the undersigned was not provided a sufficient argument as to what exactly was tainted by this warrant.[9] It is also important to note that the practices of Defendant Naum at Advance Healthcare were the basis for the allegations contained in the Indictment as to Defendant Naum. Accordingly, the undersigned finds that if the Leon good-faith exception does not save the warrant and Defendant's statements was taken in violation of the constitution, the information that the Government relied on was provided through independent sources.

## IV.    RECOMMENDATION

For the above stated reasons, the undersigned **RECOMMENDS** that the Motion to Suppress be **DENIED** and the undersigned's original Report and Recommendation be **REJECTED**.

Any party shall have two days[10] from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the**

---

[9] The Government reiterated that they do not intend to use the September 13, 2016 Interview statements nor the evidence taken during the Cambridge search.

[10] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, n. 1 (N.D. W. Va., Oct. 6, 2011); United States v. Mason, 2011 WL 128566, n. 7 (N.D.W. Va. Jan. 7, 2011). The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation and will be due by March 27, 2019.

**portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a Copy of this Report and Recommendation of counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Date: March 25, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE